**Eugene WZOREK, Plaintiff,**

v.

**CITY OF CHICAGO, an Illinois municipal corporation, Defendant.**

**No. 84 C 9978.**

United States District Court, N.D. Illinois, E.D.

March 21, 1989.

John L. Gubbins, Linda Friedman, John L. Gubbins & Associates, P.C., Chicago, for plaintiff.

Eugene Wzorek, pro se.

James D. Montgomery, Corp. Counsel, Arthur N. Christie, Mary L. Smith, Jonathan Siner, A. Charles Ex, Asst. Corp. Counsel, Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRIAN BARNETT DUFF, District Judge.

This action came before this court for trial without a jury on June 29–30 and July 5–6, 1988 on the issues of liability. At the close of this evidence, the court ruled in favor of plaintiff Eugene Wzorek and ordered further trial on damages. The trial resumed on November 1–2, 1988. The court has heard the evidence and has considered the testimony, exhibits, memoranda of law and arguments of Wzorek *pro se* and counsel. Now fully advised in the premises, the full trial on Wzorek's claim having been concluded, the court finds the following facts:

1. Eugene Wzorek started working for the City of Chicago in 1973 as a Motor Truck Driver for the Streets and Sanitation Department. In 1977, he was appointed to the position of Motor Truck Driver for the Department of Sewers of the City of Chicago. Wzorek continued to work in that position until June 29, 1984, when he was discharged.

2. Wzorek had a non-career service status known as Departmental Employment Service ("DES") from March 22, 1977 until December 31, 1983. DES employees consist largely of tradesmen.

3. In December 1983, the Chicago City Council created a probationary period of six months for all DES employees, after which the City would either terminate the employee or advance him or her to full career service status.

4. Dr. Charles A. Pounian was the Commissioner of the Department of Personnel of the City of Chicago at the time the City Council created the DES probationary period. The City vested the Commissioner with the authority to issue personnel rules.

5. On January 10, 1984, Pounian issued a memorandum regarding probationary employees. Under the rules stated in this memorandum, a department head could discharge a probationary employee during the probationary period simply by firing the employee, completing discharge forms, and

forwarding the forms to the Commissioner. The Commissioner would then notify the former employee in writing of the reasons for discharge. The January 1984 memorandum required probationary employees to be given numerical ratings for their performance.

6. On May 3, 1984, the Commissioner of Personnel issued a new memorandum abolishing the probationary ratings and informing department heads that judgment concerning the probationary period would be made thereafter on the basis of new criteria set forth in the memorandum.

7. On October 1, 1983, Eugene M. Barnes became acting Commissioner of the Department of Sewers of the City of Chicago. Barnes's immediate predecessor was Edward Quigley.

8. Before the start of the DES probationary policy, Barnes had a meeting with his department supervisory personnel. Barnes told these supervisors to write probationary employees up or else he would write them up and would get rid of them. John Lucille was one supervisor who rated probationary employees, Wzorek among them. Lucille testified that his rating cards or slips had numbers on top indicating in which ward the employee lived. Lucille testified further that during the probationary period, if someone got transferred into the district, the first thing that was done was to give the person a ward card and let him fill it out. Lucille sent ward cards downtown.

9. Barnes testified that poor work performance and excessive absenteeism during the probationary period were his primary criteria for deciding whether he would deny career service status to a probationary employee. Pounian testified that if a person had completed the probationary period successfully, it would raise question in his mind if a supervisor subsequently recommended dismissal based on behavior or incidents dating from before the probationary period. While Pounian testified further that a department head could consider incidents that took place prior to the probationary period in reaching a dismissal

decision, department heads seldom considered prior actions.

10. Wzorek's first and only interim probationary review was good. He received a numerical rating of 85 out of 100. According to one of Wzorek's supervisors, William Sommerford, Wzorek was a pretty good employee. Commissioner Pounian testified that only under extremely unusual circumstances would a person get an 85 on his performance rating, but then do one of the 27 things listed in the May 3, 1984 directive as grounds for discharge. Pounian stated that someone could have an 85 rating and then commit some act subsequent to that rating to warrant discharge. If someone had committed such an act, city personnel should have noted it on the employee's discharge sheet.

11. On June 29, 1984, Commissioner Barnes wrote to Commissioner Pounian that he intended to discharge Wzorek for poor work performance. On July 6, 1984, Commissioner Pounian wrote to Wzorek that the reason for his discharge was poor performance. Neither Barnes nor Pounian identified excessive absenteeism as a basis for discharging Wzorek.

12. As Commissioner, Barnes had the authority to discharge DES probationary employees. Barnes was not directly involved, however, in the evaluation of employees. He relied instead on the evaluations and reasons of supervisory personnel subordinate to him. Commissioner Barnes authorized Wzorek's discharge upon the recommendation of William Sommerford, a Barnes appointee. Sommerford's name appears on Wzorek's firing slip along with Eugene Barnes's name. Sommerford was the General Superintendent of the Cleaning Division for the Department of Sewers of the City of Chicago.

13. Ned Madia was a foreman of the Cleaning Division for the Department of Sewers for the City of Chicago, and was another of Eugene Wzorek's supervisors. Madia gave Wzorek ratings in the eighties, which were more than acceptable.

14. Approximately 57 probationary career service employees in the Department of Sewers did not successfully complete the

six-month probationary period and were discharged on June 29, 1984. Of these, 29 were from the 27th Ward, the ward of Barnes's predecessor, Quigley.

15. In October 1982, Wzorek and William McDermott delivered a joint campaign contribution of $1,000 to Richard M. Daley in support of Daley's campaign for Mayor of the City of Chicago. McDermott was subsequently transferred off Wzorek's truck after he gave a statement on the incident to Wzorek's attorney. William Sommerford warned Wzorek not to contribute to Daley's campaign, stating that Wzorek could get in trouble further down the line. Sommerford also told Wzorek, "You better hope the right person is going to win, you only got a one out of three shot."

16. In 1983 Sommerford told Wzorek to "straighten out" in Wzorek's ward, that he wasn't "paying dues." Sommerford told Wzorek that he would have to start paying dues and that "they can get around the Shakman law. They have got real good lawyers downtown." Sommerford further told Wzorek that "it is still the same game only played a different way." Sommerford told Wzorek that he could get in trouble for giving Daley $1,000, and that Wzorek would have been better off giving the money to Jane Byrne or Harold Washington because Daley had enemies. Sommerford told Wzorek further, "you might have made a mistake because Jane Byrne is the incumbent." Wzorek at first tried to hide his donation from Sommerford, but later he admitted it. Ronald P. Goorsky was present at this conversation.*

* In a response to Wzorek's proposed findings of fact, the City suggests that Goorsky was incredible. This stems from an incident that occurred after this court dismissed Goorsky as a witness. The following exchange took place shortly after the witness following Goorsky took the stand:

MR. EX: Your Honor, I am very sorry to interrupt, but I have to report something I feel I have an obligation to put on the record.

Mr. Sommerford, who is a witness that was requested by Mr. Wzorek, is sitting outside. It has been brought to my attention that a series of harassing and threatening comments have been made to him by Mr. Goorski.

MR. WZOREK: I wasn't out there, your Honor.

MR. EX: Very improper, and I would move to exclude Mr. Goorski from the courtroom and from this floor.

THE COURT: Well, he was excused.

MR. WZOREK: Yes, he can go.

THE COURT: As a witness, but I can't take just a bare allegation like that. Do you want to have a hearing on it? I will be glad to. Did you hear it, sir?

MR. EX: I did not personally hear it. He just reported to me. I believe, Mary, did you hear?

MS. SMITH: We were in the courtroom, your Honor. Mr. Goorski finished testifying. He left the courtroom, saw Mr. Sommerford sitting outside the courtroom and then made the comment to him that he made.

THE COURT: Mr. Sommerford, what comments did he make?

MR. WZOREK: He is not here.

MR. EX: He is sitting outside.

THE COURT: Bring him in.

MR. WZOREK: I wasn't out there. I don't know.

THE COURT: Don't worry about it. Bring Mr. Sommerford up to the lectern. I would like to speak to him, and you, Mr. Ex.

Mr. Sommerford, Mr. Ex says that some comment was made to you that you didn't like. Tell me what was said.

MR. SOMMERFORD: Yes. A gentleman came out there and called me a dog, you ugly sonofabitch.

THE COURT: Called you a what?

MR. GOORSKI: Your Honor—

THE COURT: Just a minute. Called you a what?

MR. SOMMERFORD: A dog, ugly sonofabitch.

THE COURT: Is that it?

MR. SOMMERFORD: And he came out there the last time, and the first time I came in here, I never seen him to know him, he said, you no good sonofabitch. This gentleman here.

THE COURT: Anything else?

MR. SOMMERFORD: That's all he said.

THE COURT: Thank you, sir. You may be excused.

Mr. Goorski, you want to say anything?

MR. GOORSKI: Your Honor, I don't even know that was Mr. Sommerford. I never met him before.

MS. SMITH: If you recall Mr. Goorski's testimony he was present at the conversation with Mr. Sommerford.

MR. GOORSKI: He had more hair.

MS. SMITH: Mr. Goorski made a slashing gesture across his throat. Obviously if he can testify to a conversation with Mr. Sommerford and statements that Mr. Sommerford made back in 1982, he certainly knows this man.

MR. GOORSKI: That is six years later.

MR. WZOREK: I object to this.

THE COURT: Be quiet everybody. Thank you, Mr. Sommerford. You are excused.

THE COURT: Mr. Goorski, you are now under instructions, I am not even going to

17. Mr. Wasilewski, a person who was an engineer or head of trucks, later threatened Wzorek after a truck broke down. He told him: "You're through. You're going to be fired now. I told Sommerford to write you up and reprimand you." He told Wzorek he would "teach each of those guys a lesson over there at 75th." Wzorek told Wasilewski that he was not responsible for the failure of the truck, as he was ill on the day that the truck broke down.

18. On the day after aldermanic elections in 1984, Ned Madia yelled to Eddie Costa, a maintenance man, "Hey, look what happened in the 12th Ward. One of our guys beat that Polack," referring to Alderman Molaro's defeat of Alderman Majerczyk. Wzorek was from the 12th Ward and was in Madia's presence when Madia made the remark. Madia further stated that Wzorek had "better really shape up," and that Wzorek would have to pay his dues and knock on doors better. At that time Wzorek was not paying his dues because his house had burned down, and he did not have the money. Wzorek said that he would try to catch up on his dues. Wzorek's District Supervisor, Mike DiFacova, said Daley was a punk who was ruining the organization. Madia said that Daley wasn't like his father.

19. Wzorek was told he should take off bumper stickers and campaign buttons supporting Daley. Supporters of Washington and Byrne did not have to take off their campaign paraphernalia. Daley materials were burned in the yard. Sommerford testified that a rule prohibited employees from putting "stickers and things" on city property. If such a rule existed, it was observed in the breach.

20. In a letter to Eugene Barnes dated June 26, 1984, Sommerford requested that Barnes fire Wzorek. Prior to sending the letter, Sommerford asked Lucille, Wzorek's immediate supervisor, if there was anyone he was going to get rid of. Lucille told Sommerford there was no one.

21. Wzorek was never given an exit interview after his discharge. Exit interviews have several purposes, including protecting the City against fraudulent unemployment compensation claims and documenting the reason that a person left the City's employ.

22. The reasons for Wzorek's discharge given at trial were: (1) a violation of a helmet rule, (2) insubordination, (3) causing a clutch to implode on two occasions, and (4) excessive absenteeism.

23. The helmet incident occurred in 1981, three years before Wzorek's discharge. Wzorek had been inside a truck and the helmet had been stolen. Wzorek received a written reprimand for going without a helmet.

24. The insubordination incident stemmed from Wzorek's leaving work on account of illness. This occurred in June 1982. The City docked Wzorek fourteen hours on account of his supposed failure to follow orders, which in any event was not a clear violation of City rules.

25. The imploding clutch incidents occurred years prior to Wzorek's discharge. No evidence demonstrated or supported the conclusion that the damage to a truck was due to negligence on Wzorek's part.

inquire about anything else, not to communicate with anybody at all.

Is there any possibility Mr. Goorski is going to be recalled as a witness in this case?

MR. WZOREK: Not that I know of.

THE COURT: If there is, we probably shouldn't have him here in the courtroom. Can I suggest to you, Mr. Goorski, we won't need you more today, and it might be a good idea since that fellow is so irate, you might absent yourself, and then you can call Mr. Wzorek tonight and see if he needs you tomorrow.

MR. GOORSKI: All right. Thank you, Your Honor.

THE COURT: But don't discuss your testimony with anybody. Thank you.

MR. WZOREK: I forgot where I was.

THE COURT: Help like that you don't need, Mr. Wzorek.

What the court fails to believe in this instance was Goorsky's claim that he had never seen Sommerford before. This court will not prefer Goorsky's unsworn response to the court's inquiry into his ungentlemanly conduct over his sworn testimony, which the City subjected to cross-examination. Nothing elicited on the stand suggests to this court that Goorsky would have cussed at someone he had not known.

26. During his probationary period Wzorek was absent without pay from work a total of 7¾ days. According to Commissioner Barnes, excessive absenteeism such as would warrant discharge of a probationary employee in the Department of Sewers was absence without pay for ten or more days.

27. Wzorek received $6,118 in unemployment compensation from the Illinois Department of Labor, Bureau of Employment Security, as a result of his termination.

28. Pursuant to Ill.Rev.Stat. ch. 48, ¶ 555 B (Smith–Hurd Ann.1987), the City of Chicago reimburses the State of Illinois for all unemployment benefits paid to former City employees. This method of reimbursement was in effect while Wzorek received the unemployment benefits described above. The City of Chicago reimbursed the State of Illinois $6,118.

29. Upon termination from City employment, Wzorek was entitled to continue coverage under the medical plan in which he was enrolled during the course of his employment with the City. Wzorek did not elect to continue his medical coverage subsequent to his termination because he could not afford it.

30. Wzorek did not obtain substitute health and/or medical insurance subsequent to his termination, as he had no income. He chose not to apply for disability benefits with the Social Security Administration.

31. Wzorek has not actively sought employment since 1986, nor was he capable of doing so at the time of trial.

32. In the opinion of a court-appointed psychiatrist, Dr. Jan Fawcett, Wzorek was not capable of working in any capacity for approximately six to twelve months at the time of trial. Dr. Fawcett further suggested that the City's termination of Wzorek was the cause of Wzorek's incapacity, which is emotional in nature. Dr. Fawcett's testimony was sound, professional, and credible in most respects on the information available. The court observes further that after his termination, Wzorek was not emotionally capable of doing what he could have done before he was terminated.

33. Had the City of Chicago retained Wzorek, it would have paid him $132,825.33 in wages and salary. He would have earned $13,833.35 in interest. He has incurred $3,750 in medical expenses and $870 in prescriptions since his departure.

## CONCLUSIONS OF LAW

This court has jurisdiction over this cause and the parties pursuant to 28 U.S.C. § 1331 (1982), and by reason of the consent decree entered in 1972 in *Shakman v. Democratic Organization of Cook Cty.*, 481 F.Supp. 1315, 1356, 1358–59 (N.D.Ill. 1979). Wzorek has petitioned this court for relief for a violation of that decree. To establish a violation, Wzorek must establish that he is a person protected under the decree, that he engaged in protected political associations, that he was discharged, and that a motivating factor in the decision to fire him was his political associations. See *id.* at 1358; *Shakman v. Democratic Organization of Cook Cty.*, 533 F.2d 344, 351 (7th Cir.1976). Wzorek must establish these propositions by clear and convincing evidence. *Id.*

There is no dispute that the *Shakman* decree protected Wzorek and that he was discharged. There is little question as well that Wzorek engaged in protected political acts of association: Wzorek supported Richard M. Daley, financially and otherwise, in his campaign for Mayor of the City of Chicago. The key question is whether these acts were a motivating factor in his discharge. For this court to grant Wzorek relief, Wzorek must demonstrate that but for his association, he would not have been terminated. See *Mt. Healthy City Board of Ed. v. Doyle*, 429 U.S. 274, 285–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977).

■ This court concludes that Wzorek has demonstrated by clear and convincing evidence that his political associations were a motivating factor in his discharge. Wzorek's supervisors, Sommerford, Wasilewski, and Madia, wished to discharge Wzorek principally for his political activities. They recommended discharge to Barnes,

who had the authority to terminate Wzorek. Since the court can attribute the improper motivation of persons recommending a discharge to the person who carries out the decision pro forma, see *Oxman v. WLS–TV,* 846 F.2d 448, 456–57 (7th Cir. 1988), this court holds that the City discharged Wzorek for improper political reasons. Through the pen of a misinformed Barnes the City thus violated the *Shakman* decree.

As a penalty for violating the *Shakman* decree, the City properly owes Wzorek back pay in the amount of $132,825.33. The court will offset against this amount the unemployment compensation received by Wzorek, $6,118, as the City reimbursed the State of Illinois for those benefits. See *Olshock v. Village of Skokie,* 541 F.2d 1254, 1260 (7th Cir.1976) (back pay awards within court's discretion); *Nottleson v. Smith Steel Wkrs. D.A.L.U. 19806,* 643 F.2d 445, 456 (7th Cir.1981) (proper to offset back pay award by amount liable party contributed to worker's unemployment compensation fund); *Syvock v. Milwaukee Boiler Mfg. Co., Inc.,* 665 F.2d 149, 161–62 (7th Cir.1981) (offsetting unemployment compensation contributions prevents double recovery).

■ Wzorek requests that this court give him pre-judgment interest on the award of back pay. Approval of such a request lies within this court's discretion. The Seventh Circuit has suggested that the courts consider in this vein the amount of evidence in support of the finding of liability, the degree to which the liable party acted willfully, and the injured party's attempts to mitigate his damages. See *id.* at 162 (presenting equitable considerations in pre-judgment interest decisions rendered under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq. (1982)). As noted above, the evidence supporting the finding that the City violated the *Shakman* decree was clear and convincing. Wzorek did not attempt to mitigate his damages, but this failure was understandable: he was and continues to be an emotional wreck. The court thus holds that an award of pre-judgment interest in the amount of $13,833.35 is appropriate in this case.

■ The wilfullness of the City's violation of the *Shakman* decree will also result in an award to Wzorek of $3,750 in medical expenses and $870 in prescriptions related to treatment of his emotional problems. This is because the City's termination of Wzorek precipitated the emotional problems which Wzorek suffers. While Judge Bernard Decker ruled earlier in this case that Wzorek could not recover damages as a matter of course for mental and emotional distress, he expressly relied on authorities submitted to him by the City that allow such recovery when the party who violates a decree of the court acts deliberately or maliciously. See, for example, *Thompson v. Johnson,* 410 F.Supp. 633, 643 (E.D.Pa. 1976), affirmed without opinion, 556 F.2d 568 (3d Cir.1977) (deliberate and malicious conduct resulting in mental anguish can be considered in assessing punishment for violation of consent decree). The actions of Wzorek's supervisors amount to such deliberate and malicious conduct that this court can, and will, assess damages for the results of that conduct.

Wzorek asks this court to impose one further sanction on the City for its violation of the *Shakman* decree: reinstatement to his former position. The Seventh Circuit has suggested that reinstatement, like other equitable remedies, is permitted in cases involving unlawful or improper termination. The decision whether to reinstate a discharged employee lies within the court's discretion, based on its assessment of the facts of each case. See *Coston v. Plitt Theatres, Inc.,* 831 F.2d 1321, 1330 (7th Cir.1987) (discussing equitable remedy of reinstatement available under ADEA); *McNeil v. Economics Laboratory, Inc.,* 800 F.2d 111, 118–19 (7th Cir.1986) (similar discussion). The aggrieved person must be presently qualified, however, for the position he or she seeks. See *Franks v. Bowman Transportation Co.,* 424 U.S. 747, 772 n. 31, 96 S.Ct. 1251, 1268 n. 31, 47 L.Ed.2d 444 (1976) (present qualification needed for equitable reinstatement under Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. §§ 2000e et seq. (1982)); *Kamberos v. GTE Automatic Elec., Inc.,* 603 F.2d 598, 603 (7th Cir.1979) (same).

■ As this court found above, Wzorek is presently incapable of working. The court thus will not reinstate him to his former position at this time. In the opinion of Dr. Fawcett, Wzorek could recover from his emotional infirmities, and thereby resume work, within the year. In the interim, the court will award Wzorek front pay and benefits. See *McNeil,* 800 F.2d at 118 (front pay appropriate where aggrieved party has no reasonable prospect of obtaining work, or where award period is relatively short). The court will decide in supplemental proceedings within a reasonable time after November 1, 1989 whether Wzorek can or should be reinstated, or if some other form of prospective relief is appropriate. The court reminds Wzorek that if he is capable of resuming work sooner, he has a duty to make reasonable efforts to mitigate his damages. See *id.*

Despite his emotional fragility, and largely without the aid of learned counsel, Eugene Wzorek has prevailed against the sinister forces that precipitated his illegal termination. Wzorek is indeed the worse for his experience, although he should take pride in his efforts before this court. His case is an example of how the judicial system helps protect important political freedoms, albeit retrospectively.

This court enters judgment in favor of Eugene Wzorek. The court awards him back pay, pre-judgment interest, and medical and prescription expenses in the amount of $145,160.68. The court further awards Wzorek front pay and benefits. The court will treat Wzorek's request for reinstatement in supplemental proceedings.