Eugene WZOREK, Petitioner–Appellee,

v.

CITY OF CHICAGO, a Municipal Corporation, Respondent–Appellant.

Nos. 89–1868, 89–2988.

United States Court of Appeals,
Seventh Circuit.

Argued May 11, 1990.

Decided July 13, 1990.

John L. Gubbins, Linda Friedman, Gubbins & Associates, Mark LeFevour, Chicago, Ill., and Terrance Mitchell, Homewood, Ill., for plaintiff-appellee.

Lawrence Rosenthal, Asst. U.S. Atty., Arthur N. Christie, Mary L. Smith, James D. Montgomery, Corp. Counsel, Kelly R. Welsh, Asst. Corp. Counsel, and Ruth M. Moscovitch, Asst. Corp. Counsel, Appeals Div., Jonathan P. Siner, Mardell Nereim, Office of the Corp. Counsel, and Donald Hubert, Chicago, Ill., for defendant-appellant.

Before CUMMINGS, EASTERBROOK and RIPPLE, Circuit Judges.

CUMMINGS, Circuit Judge.

The City of Chicago (the "City") appeals from two orders of the district court involving a finding of civil contempt against the City under the so-called *Shakman* decree, which seeks to limit the effects of political patronage in the treatment of City employees. See *Shakman v. Democratic Org. of Cook County*, 481 F.Supp. 1315, 1356–1359 (N.D.Ill.1979), reversed in part *sub nom. Shakman v. Dunne*, 829 F.2d 1387 (7th Cir.1987), certiorari denied, 484 U.S. 1065, 108 S.Ct. 1026, 98 L.Ed.2d 991.

The first order (appealed in our case No. 89–1868) is dated April 27, 1989. It requires the City to pay petitioner Eugene Wzorek $145,160.68 in back pay, prejudgment interest, and medical and prescription expenses as compensation for terminating Wzorek as a City truck driver because of his involvement in municipal partisan politics. The second order under appeal (our No. 89–2988) is dated September 6, 1989.

In it, the court: (1) denied petitioner's reinstatement to his city job on the ground that he was still emotionally incapable of returning to work; (2) increased the amount of back pay by $14,500, plus $362.50 prejudgment interest; (3) added front pay for one year (with a present value of $33,518.17) in lieu of reinstatement; and (4) ordered the City to provide for petitioner's psychiatric treatment for two years at a cost not to exceed $150,000. See *Wzorek v. City of Chicago*, 708 F.Supp. 954 (N.D.Ill. 1989).

The City argues that the petitioner failed to prove that those City officials with authority to terminate him acted for political reasons and also that the award for psychiatric care was in error. The relief ordered by the district court in its April 27, 1989, order, as supplemented in its September 6, 1989, order, is affirmed except with respect to payment for Wzorek's psychiatric treatment for the next two years. *Wzorek v. City of Chicago*, 718 F.Supp. 1386 (N.D.Ill. 1989).

## I.

### A.

In the main, the City does not attempt to meet the heavy burden under Fed.R.Civ. Proc. 52(a) of proving that the district court's factual findings were clearly erroneous. Instead, the City primarily argues that, even under the facts found by the district court, the City cannot be held liable for the impermissible political motivations of its "middle managers" which violate the terms of the *Shakman* decree if its top supervisors were unaware of those motivations.

Petitioner Wzorek, now 45, was employed by the City of Chicago's Department of Sewers as a probationary truck driver. During his city employment, Wzorek was a resident of the 12th Ward on Chicago's southwest side, where he supported the campaign of the present Mayor Richard M. Daley, financially and otherwise, in Daley's unsuccessful 1983 mayoral primary campaign. Harold Washington won the primary election.

While a probationary employee, Wzorek received an estimable 85 out of 100 performance rating. During the crucial period of Wzorek's employment, Eugene Barnes was the City's Acting Commissioner of the Department of Sewers. William Sommerford, the General Superintendent of the Cleaning Division for the Department of Sewers, and Ned Madia, a foreman of the Cleaning Division, were supervisors of Wzorek. Sommerford and Madia were hostile to the Daley 1983 mayoral primary campaign. After discovering that the petitioner had contributed money to the Daley campaign, Sommerford told the petitioner not to contribute again because he could get into trouble later down the line, and that Wzorek better hope the right candidate was going to win the primary. Petitioner was required to remove his Daley button and bumper stickers while others were permitted to wear their rival Jane Byrne and Harold Washington buttons. Sommerford also told Wzorek to pay his dues to the 12th Ward Regular Democratic Organization and that the restrictions of the *Shakman* decree could be avoided. Madia criticized Richard M. Daley and stated that Wzorek "better shape up" and pay 12th Ward dues.

When Eugene Barnes became Acting Commissioner of the Department of Sewers under Mayor Washington he told his supervisors that he was not going to make the 800 employees of that department into discharge-proof career service personnel. Barnes noted that the 27th Ward had supported Jane Byrne in the primary election. Under Barnes, 57 Department of Sewers probationary employees were discharged, including 29 from the 27th Ward. Barnes also allowed the petitioner to be fired as an unsatisfactory employee upon the recommendation of Sommerford. Although Sommerford later testified that petitioner was a good employee, on June 29, 1984, Barnes wrote to Dr. Charles Pounian, Commissioner of Personnel, that Barnes intended to discharge petitioner for poor work performance, the excuse also given by Sommerford. Consequently, on July 6, Pounian wrote petitioner that he had been discharged for that reason.

The district judge found that Wzorek's political activities were a motivating factor in his discharge. He noted that petitioner's three supervisors wanted to discharge petitioner for his unsympathetic political activities and therefore had recommended that Barnes fire him.

### B.

A bench trial on liability was held during four days in June and July 1988 and the damages issue was heard in November 1988. On March 21, 1989, the district court awarded the petitioner damages in the amount of $145,160.68. *Wzorek v. City of Chicago*, 708 F.Supp. 954 (N.D.Ill.1989) (back pay of $132,825.33, plus prejudgment interest of $13,833.35 and $4,620 in medical expenses and prescriptions; offset by $6,118 in unemployment compensation payments made by the State of Illinois to the petitioner and refunded to the State by the City). However, the court reserved ruling on whether the petitioner should be reinstated to his job in the future and did not specify the dollar amount of the "front pay and benefits" that might be awarded if reinstatement was not appropriate. The court stated that it would treat Wzorek's request for reinstatement in supplemental proceedings "within a reasonable time after November 1, 1989." *Id.* at 961. The City did not appeal from the March 21 judgment. On April 27, 1989, the district judge directed the City to pay the March 21 judgment by May 1, 1989. This time the City did appeal.

The City filed an emergency motion to stay the April 27 order. The petitioner asserted that this Court lacked jurisdiction to consider the appeal, contending that the March 21, 1989, judgment was final and that the time in which to file an appeal from that judgment had run. This Court subsequently decided that the March 21, 1989, order was not final and that this Court has jurisdiction to review the April 27, 1989, non-final order under the collateral-order doctrine of *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 546–547, 69 S.Ct. 1221, 1225–1226, 93 L.Ed. 1528; *Palmer v. City of Chicago*, 806 F.2d

1316, 1318–1320 (7th Cir.1987), certiorari denied, 481 U.S. 1049, 107 S.Ct. 2180, 95 L.Ed.2d 836. We adhere to that ruling.

In July 1989, the petitioner requested a hearing on his possible reinstatement to his City job. A hearing was held on that subject on August 16. On September 6, 1989, the district court issued the findings and conclusions of law supporting the order described above. *Wzorek v. City of Chicago*, 718 F.Supp. 1386 (N.D.Ill.1989).

### C.

Debate will undoubtedly continue regarding the wisdom of judicial restrictions on patronage. Compare R.F. Nagle, Constitutional Cultures: The Mentality and Consequences of Judicial Review 10, 37 & n. 71 (1989) with Laycock, "Notes on the Role of Judicial Review, the Expansion of Federal Power, and the Structure of Constitutional Rights," 99 Yale L.J. 1711, 1722–1724 (1990). Yet a majority of the Supreme Court has reaffirmed the vitality of the Court's line of cases holding that judicial restrictions may be placed upon "spoils systems" that violate the First Amendment. *Rutan v. Republican Party of Illinois*, —— U.S. ——, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990).

In any case, the City asserts that it does not take issue with the anti-patronage case law and that it now respects the *Shakman* decree. Nor does the City argue that political affiliation could be considered relevant in any way to the petitioner's City job. See *Rutan*, 110 S.Ct. at —— n. 5 (Stevens, J., concurring). The City argues instead that it cannot be held vicariously liable for the actions of maverick middle managers taking politically motivated actions on their own because it never consented to assume such liability. To understand that claim a brief overview of the history of the extensive *Shakman* litigation is necessary.

In 1969, an independent candidate running as a delegate to the Illinois Constitutional Convention and one of his supporters filed a class action suit under 42 U.S.C. §§ 1983, 1985, 1986, and 1988 against various public and private bodies, including the City and its Mayor, alleging deprivations of

freedom of speech and association, and violations of due process and equal protection of the law. *Shakman v. Democratic Org. of Cook Co.*, 310 F.Supp. 1398 (N.D.Ill. 1969). The plaintiffs alleged that the local Democratic Party, working in conjunction with patronage schemes in place within the City and Cook County (the "County") governments, had used governmental power and public funds to create a system of rewards and punishments that effectively stifled speech, freedom of association, and independent political activity on the part of City and County employees. The plaintiffs alleged that this patronage system violated constitutional and other rights of political candidates, voters, taxpayers, and city workers. The district court dismissed the suit, ruling in part that the plaintiffs lacked standing to allege the harm done to patronage employees. *Id.* at 1402.

This Court reversed upon reasoning not directly relevant to these appeals and remanded the case for further proceedings. *Shakman v. Democratic Org. of Cook Co.*, 435 F.2d 267 (1970). After the Supreme Court denied certiorari, 402 U.S. 909, 91 S.Ct. 1383, 28 L.Ed.2d 650, the plaintiffs entered into a consent decree with the defendants in 1971, the text of which may be found in *Shakman v. Democratic Org. of Cook Co.*, 481 F.Supp. 1315, 1356–1359 (N.D.Ill.1979). On May 5, 1972, the district court approved the consent decree as a settlement under Rule 23(e) of the Federal Rules of Civil Procedure. The decree established municipal liability through various provisions, including one which enjoins the City "from directly or indirectly, in whole or in part: (1) conditioning, basing or knowingly prejudicing or affecting any term or aspect of governmental employment, with respect to one who is at the time already a governmental employee, upon or because of any political reason or factor." 481 F.Supp. at 1358 (¶ E). The decree is binding upon "the present and future officers, members, agents, servants, employees and attorneys of" the City. *Id.* at 1358 (¶ C(44)).

In 1976, this Court affirmed a finding of civil contempt against the City and the City's then Director of Administration of the Department of Streets and Sanitation, Michael Cardilli, for violating ¶ E of the decree quoted above by requiring city employees to circulate petitions for the candidacy of then Mayor Richard J. Daley. *Shakman v. Democratic Org. of Cook Co.*, 533 F.2d 344 (hereinafter *Cardilli*), certiorari denied, 429 U.S. 858, 97 S.Ct. 156, 50 L.Ed.2d 135. On the issue most relevant to these consolidated appeals, the City argued that it could not be held in contempt "because Cardilli's [politically motivated] conduct was clearly outside the scope of his employment." *Id.* at 352. The Court disagreed, holding that Cardilli's actions were within the scope of his employment. Therefore the plaintiffs were not required to show that supervisory employees were authorized to undertake political functions on the job. *Id.* at 352–353.

## II.

### A.

■ Here clear and convincing evidence shows that the reason for Wzorek's discharge was that he was a Richard M. Daley loyalist rather than a supporter of then Mayor Byrne or future Mayor Washington. His failure to pay his 12th Ward dues was another factor held against him. The district court was not clearly erroneous in finding that the supposedly poor work record compiled by Wzorek was a pretext for his firing.

In rejecting the City's argument that it should not be held liable for the actions of lower-level supervisors, the district court cited *Oxman v. WLS–TV*, 846 F.2d 448 (7th Cir.1988). That case involved a claim under the federal Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.*, in which the defendant employer claimed that the wrongful termination of the plaintiff based upon his age could not be imputed to the supervisor who actually made the decision to fire the plaintiff. This Court held that it was "reasonable," based on the facts in the record of that case, to infer that the improper reasons found to have motivated a lower-level supervisor in recommending termination of the plaintiff

were shared by the supervisor who actually terminated the plaintiff. *Id.* at 456–457. This holding in *Oxman* is not an application of respondeat superior principles. Instead it is a rule governing permissible inferences in allegedly pretextual terminations for illegitimate reasons. Such an inference is not available in this case. The district court specifically found that Barnes was "misinformed" as to the true grounds for Wzorek's termination, *Wzorek*, 708 F.Supp. at 959–960, and the petitioner has not shown that the court's finding was clearly erroneous.

Nevertheless the City's argument that it is not liable for its agents' breaches of the *Shakman* decree is foreclosed by the holding discussed above. *Cardilli*, 533 F.2d at 352–353. The Court not only called the contrary argument "patently frivolous," but it put the City on notice that it was under an obligation to police its employees, lest the door be opened " 'for wholesale disobedience of the Court.' " *Id.* at 353 n. 13 (quoting *Singer Mfg. Co. v. Sun Vacuum Stores, Inc.*, 192 F.Supp. 738, 741 (D.N.J.1961)). Penalties for civil contempt here are intended to coerce the City's managers and supervisors into taking the concrete steps necessary to prevent all of those with supervisory responsibilities from violating the decree. Blind faith in middle managers will not do.

There is no doctrine of respondeat superior under 42 U.S.C § 1983. *Riordan v. Kempiners*, 831 F.2d 690, 695 (7th Cir. 1987). That is irrelevant, however, because this is a civil contempt action based upon a consent decree entered into well in advance of *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611, which gave birth to municipal liability under the civil rights statutes. At the time the City settled the *Shakman* case with the consent decree, municipalities could not be held liable at all as "persons" for purposes of § 1983. *Monroe v. Pape*, 365 U.S. 167, 187–192, 81 S.Ct. 473, 484–487, 5 L.Ed.2d 492. Therefore the only conceivable function of having the City bind itself was to be answerable for the deeds of its employees. There is no reason to think that the City divined the compromise that was to come years later in *Monell:* cities become "persons," but are not vicariously liable.

Counsel for the City stated at oral argument in this appeal that the City made "an improvident concession" in 1976 in arguing the *Cardilli* case before this Court by admitting to respondeat superior liability. It is far more likely that the City, under intense pressure to resolve the *Shakman* litigation, made large concessions in 1971 that a new generation of City managers now wishes to take back. Nowhere in the *Shakman* decree is the City shielded from the acts of so-called "middle managers," an ill-defined group of supervisory workers who are outside the reach of the decree. The voluminous jurisprudential record of the *Shakman* litigation suggests instead that the extent of City liability has always been considered vast. See, *e.g., Shakman v. Democratic Org. of Cook Co.*, 569 F.Supp. 177, 184 (N.D.Ill.1983) (detailed implementation decree enforcing prohibition on patronage hiring) (judgment "applies to [City's and Mayor's] successors in office, to all of their agents and employees and to all others who receive notice of the Judgment and who are in active concert or participation with any of such persons.").

The consent decree binds the City to liability under respondeat superior analysis. In this case there can be no argument that the supervisors who had the petitioner fired for his political activity acted outside the scope of their employment. The City's managers must assume responsibility for the politically motivated actions of employees which violate the decree. That may not be a simple task within a municipal government of 40,000 employees, but it is a task the City assumed by consenting to the decree.

**B.**

■ The case law fully supports an award of damages for a violation of the decree. *Hutto v. Finney*, 437 U.S. 678, 691, 98 S.Ct. 2565, 2573–2574, 57 L.Ed.2d 522 (civil contempt may be punished by a remedial fine, compensating party who won

injunction for the effects of noncompliance); *Connolly v. J.T. Ventures*, 851 F.2d 930, 933 (7th Cir.1988) (courts have broad discretion to fashion remedies tailored to harm while considering likely effects of alternative remedies). The City's only complaint involves the award for psychiatric damages. In compelling the City to pay up to $150,000 for Wzorek's psychiatric treatment for the next two years, the district court reasoned that Wzorek's discharge triggered Wrozek's mental illness and made him unfit to obtain employment.

■ Before this case was assigned to Judge Duff, predecessor Judge Decker had stricken that part of Wzorek's petition requesting damages for medical expenses and mental distress. The doctrine of the law of the case prevents reconsideration of that decision barring "unusual circumstances or a compelling reason." *Parts and Electric Motors, Inc. v. Sterling Electric, Inc.*, 866 F.2d 228, 231 (7th Cir.1988), certiorari denied, — U.S. ——, 110 S.Ct. 141, 107 L.Ed.2d 100. There has been no showing that would make this doctrine inapplicable.

Law of the case does not prevent a reviewing court from examining the earlier decision. *Cohen v. Bucci*, 905 F.2d 1111, 1112 (7th Cir.1990). Numerous factors support Judge Decker's decision. First, Judge Duff in his September 1989 conclusions of law found that "it is not clear to what degree Wzorek's present [mental] condition is the result of the City's original violation." *Wzorek*, 718 F.Supp. at 1388. Second, the district court based the $150,-000 award for psychiatric care upon: (1) the petitioner's lack of resources and failure to seek public assistance or insurance coverage; and (2) the City's failure to pay the March 1989 order awarding Wzorek $145,160.68 promptly instead of appealing therefrom. *Id.* However, this Court had stayed that order and the City's exercise of its right to appeal cannot be the basis for awarding Wzorek his psychiatric expenses for the ensuing two years. Since the City's conduct was never alleged to be deliberate and malicious, recovery for mental distress was not warranted. *Thompson v. John-*

*son*, 410 F.Supp. 633, 643 (E.D.Pa.1976), affirmed without published opinion, 556 F.2d 568 (3d Cir.1977). Third, the medical records show that Wzorek's physician did not even refer Wzorek to a psychiatrist until more than a year after discharge, thus weakening any inference that his condition was caused by the discharge, nor has he sought psychiatric care even though such care is obtainable without ability to pay. All of these reasons support Judge Decker's grant of the City's motion to strike this request for recovery.

### III.

The order requiring the City to pay $150,000 worth of petitioner's psychiatric bills is reversed. In all other respects, the April and September 1989 orders are affirmed.