FEDERAL MARKETING COMPANY,
Appellant/Cross Appellee,

v.

VIRGINIA IMPRESSION PRODUCTS
COMPANY, INC., et al., Appel-
lees/Cross Appellants.

No. 98–CV–960, 99–CV–231.

District of Columbia Court of Appeals.

Argued Nov. 16, 2000.
Decided May 15, 2003.

John J. Vecchione, Washington, DC, for appellant/cross-appellee.

Russell J. Gaspar, with whom Andrew J. Mohr and Rowena E. Laxa were on the briefs, Washington, DC, for appellee/cross-appellant.

Before STEADMAN, SCHWELB and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

The trial court found Virginia Impression Products Company, Inc. ("VIP"), in civil contempt of a 1982 consent decree that prohibited it from conducting business in the District of Columbia in the name of Federal Marketing Company. At the behest of the parties, the court referred the question of sanctions to two court-appointed co-special masters. Adopting their findings and recommendations, the court awarded $307,384.93 to Federal Marketing Company ("FMC"). Both parties appealed.[1]

In summary, the main issues before us are (1) whether FMC is entitled to enforce the consent decree despite its own cessation of business activity; (2) whether the trial court construed the consent decree correctly; (3) whether the trial court erred in applying the equitable doctrine of laches to preclude recovery for pre–1989 violations of the consent decree; (4) whether the trial court abused its discretion in awarding FMC attorneys' fees; (5) whether the trial court abused its discretion in declining to award prejudgment interest; and (6) whether the trial court erred in accepting the findings of the co-special masters.

While some of the issues are close ones, neither FMC nor VIP persuades us to disturb the trial court's rulings. We affirm its award.

I.

FMC is a District of Columbia corporation that was founded in 1978 to engage in the business of selling office equipment and supplies to the federal government and other customers. In 1981, FMC learned that its Richmond-based competitor, VIP, was marketing to the federal government through a subsidiary called Federal Marketing Company of Virginia, Inc. FMC objected to VIP's use of the name "Federal Marketing" in the District of Columbia, and VIP agreed to discontinue such use.

---

1. VIP's chief executive officer, Donald H. Redman, is also a party to this appeal.

FMC soon concluded that VIP was not living up to its promise. Further negotiations ensued, culminating in the filing by FMC in Superior Court of a verified complaint for injunctive and monetary relief and a proposed consent decree to which VIP had agreed. The court signed the consent decree, captioned a "final judgment of permanent injunction," on March 3, 1982. The decree enjoined VIP, its chief executive officer Donald Redman, and persons acting in concert with them "from conducting business in the District of Columbia through the use of any name not readily distinguishable from Federal Marketing's name." The decree specifically prohibited VIP from participating in an upcoming Washington, D.C. trade show and from maintaining any listing in the District of Columbia telephone directory under the Federal Marketing name. These prohibitions were subject to the proviso that VIP would be permitted to use the name "FMC of Virginia, Inc."

The consent decree further provided that if VIP violated its terms, VIP "shall, upon application by Federal Marketing, be ordered to account to Federal Marketing for all profits made by [VIP] from conducting business in the District of Columbia using Federal Marketing's name at any time, including but not limited to prior to the filing of the verified complaint herein." Although the complaint was dismissed with the entry of the decree, the court retained jurisdiction to enforce compliance with its order.

To understand the litigation that lay ahead, it is important to note that the consent decree did not define its key terms. Most importantly, the decree did not define what activity the parties intended to cover by the phrase "conducting business in the District of Columbia through the use of" the Federal Marketing name. The decree also did not define how

"all profits made by [VIP] from conducting" such business would be measured, nor how an accounting would be performed if the court ordered one. Many difficult issues could have been avoided had the parties addressed those matters in the decree.

Almost twelve years passed after the entry of the consent decree without any question being raised about VIP's compliance. Then, in December 1993, FMC received a check payable to "Federal Marketing Company" from a District of Columbia company that had contracted with VIP to process orders under a federal contract. The check had been intended for VIP. FMC's receipt of this check roused it to investigate whether VIP had been complying with the 1982 consent decree. FMC concluded that VIP had been violating the decree in numerous ways, including: (1) bidding on and entering into government contracts in the District of Columbia under the name "Federal Marketing Company"; (2) filling orders in the District under that name; (3) receiving checks payable to Federal Marketing Company from government sources in the District; (4) mailing product catalogs bearing the name of Federal Marketing Company to governmental and other recipients in the District; (5) soliciting sales in the District under the Federal Marketing name; and (6) maintaining a telephone listing in the Northern Virginia directory under the name of Federal Marketing Company and answering calls from the District under that name. When confronted by FMC with its findings, VIP denied any wrongdoing and claimed that any violations of the consent decree were simply innocent mistakes.

On August 6, 1994, FMC filed a petition for an order directing VIP to show cause why it should not be held in contempt of the 1982 consent decree. Following over a

year of pretrial discovery and the denial of motions for partial summary judgment, the case came to trial before the court without a jury in May 1996.

At the conclusion of the trial, the court found VIP in civil contempt of the consent decree because it had made sales using the Federal Marketing name to government agencies located within the District of Columbia. These sales were not *de minimis* or innocent mistakes; despite VIP's efforts to comply with the consent decree, the court said, VIP had "continued conducting business pretty much the way [it] had been conducting business" before the decree was entered. The court rejected VIP's arguments that FMC should be denied relief and that the consent decree should be dissolved because FMC was no longer an active competitor of VIP. The court agreed with VIP, however, that the prohibitions of the consent decree did not extend to sales that VIP had made to federal agencies located outside the District of Columbia, even when those sales were pursuant to contracts VIP had obtained in the District by using the Federal Marketing name in bids and other submissions to the General Services Administration or other federal agencies. The court also agreed with VIP that FMC's demand for the profits that VIP had earned in violation of the consent decree before 1989 was barred by the doctrine of laches, since FMC had failed to take any steps to protect its rights under the decree until the end of 1993. Accordingly, the court decided to order an accounting of the profits that VIP had earned in violation of the consent decree during the five year period from 1989 through 1993, but not earlier.

The court agreed with the parties' suggestion that the accounting be referred to a special master. In view of the complexity of the task, the court selected an attorney and a certified public accountant to serve as co-special masters: Sallie H. Helm of Dickstein Shapiro Morin & Oshinsky and Marvin M. Levy of KPMG Peat Marwick. The court's referral order of December 2, 1996 directed that "[t]he investigation and examination shall encompass the period from January 1, 1989 through December 31, 1993 and shall include a determination of defendant's sales at issue, the appropriate measure of profit, and any other economic and/or accounting findings that may be relevant in the judgment of the Special Masters." The court granted the co-special masters ample authority to obtain and verify information from the parties themselves and from other sources and directed FMC and VIP to cooperate fully with the investigation. The court ordered that the co-special masters' fees and expenses were to be borne equally by FMC and VIP.

After eleven months of work, the co-special masters delivered their report. By their accounting, VIP had earned profits of $165,560.51 in violation of the consent decree during the years 1989 through 1993. The co-special masters also determined that FMC reasonably had incurred approximately $140,000 in attorneys' fees to enforce the consent decree. Accordingly the co-special masters recommended that the court award FMC a total of $305,560.51.

The court received the parties' written objections to the report and held an evidentiary hearing at which the co-special masters were available for examination. Thereafter, on May 18, 1998, the court issued an order in which it adopted the report of the co-special masters in its entirety (subject only to a small upward adjustment of FMC's attorneys' fees) and awarded $307,384.93 to FMC for VIP's violations of the consent decree. Both parties appealed.

## II.

### A.

█ In its appeal, VIP makes the threshold claim that FMC was not entitled to enforce its rights under the consent decree because it was a dormant (though not defunct) corporation that had not engaged in business for at least a decade.[2] VIP argues that since FMC was commercially inactive, it suffered no loss of profits or other injury from VIP's violations of the consent decree and no longer had an interest in its corporate name deserving of legal protection.

█ We think that the trial court was correct to reject this argument as a matter of law. FMC's alleged dormancy might have been relevant if the issue had been whether FMC was entitled to an injunction against VIP in the first place. *See Lawyers Title Ins. Co. v. Lawyers Title Ins. Corp.,* 71 App. D.C. 120, 127, 109 F.2d 35, 42 (1939) (holding that one corporation could not enjoin another corporation from using its name absent a showing of injury or the danger of public confusion). But that was not the issue, for VIP had consented to the injunction in all its terms. It was no defense to civil contempt that FMC was not injured by VIP's violation of the court order. *See, e.g., D.D. v. M.T.,* 550 A.2d 37, 44 (D.C.1988) ("[W]e know of only

two recognized defenses in civil contempt proceedings: substantial compliance and inability to do that which the court commanded."). Moreover the consent decree was a contract—a settlement agreement— as well as a court order. By its terms that contract entitled FMC to VIP's profits without proof of actual injury if VIP conducted business in the District of Columbia using FMC's name. As a voluntary settlement of a disputed claim, the consent decree was to be "construed within its four corners" and "enforced as written, absent a showing of good cause to set it aside, such as fraud, duress, or mistake." *Moore v. Jones,* 542 A.2d 1253, 1254 (D.C.1988); *accord, Camalier & Buckley, Inc. v. Sandoz & Lamberton, Inc.,* 667 A.2d 822, 825 (D.C.1995). No such showing has been made here.

█ VIP makes the related argument that the trial court at least should have dissolved the consent decree prospectively on the ground that FMC was an inactive business entity that no longer had an interest in its name to protect. In this connection, VIP also argues that the court erred in denying its motion, which it belatedly made at the close of the trial, to amend its pleadings pursuant to Super. Ct. Civ. R. 15(b) to conform to the evidence by adding a counterclaim seeking dissolution on that ground.[3] Given the

---

**2.** VIP presented evidence at trial that the government contracting business formerly carried on under the name of FMC was now being carried on by another corporation bearing a similar name, Federal Marketing *Office,* Inc. According to VIP, the owner of both corporations, William Grote, had effectively abandoned the use of the name "Federal Marketing *Company.*" When this evidence was introduced, the trial court viewed it as potentially relevant only to the issues of laches and whether FMC might be entitled to claim damages beyond those specified by the consent decree. When it became apparent at the end of the trial that VIP relied on the evidence to

show that FMC was no longer entitled to enforce the consent decree at all, the trial court ruled the evidence irrelevant to the issues before it and declined to permit FMC to present rebuttal evidence to establish that it continued to be active.

**3.** Although VIP had not moved before trial to amend its answer to include a counterclaim seeking dissolution of the consent decree, it argues that the issue of dissolution was identified in the parties' pretrial statement and trial briefs, and that it had presented evidence at trial of FMC's inactivity without objection. Rule 15(b) provides that "[w]hen issues not

state of the record, we think that VIP is not entitled to relief on these contentions. We express no opinion on whether it would be proper to dissolve the consent decree on the basis that VIP proffers, though there is reason to doubt it; for even if FMC had ceased doing business, it continued to exist as a corporation in good standing, its name still may have had value to it, it was free to resume its competitive activities, and in foregoing its claims against VIP in 1982, it furnished adequate consideration for the rights it received under the consent decree. *Cf. Moore*, 542 A.2d at 1255 ("To encourage voluntary settlements, settlement agreements should not be modified in favor of either party, absent the most compelling reasons."). Be that as it may, the trial court made no findings as to whether FMC had ceased doing business. Having precluded FMC from presenting evidence on that question, *see* footnote 2, *supra*, the court was in no position to make such findings or to decide the issue of dissolution in VIP's favor—and neither, therefore, are we.

■ In addition, as we understand the trial court's ruling, it denied VIP's eleventh hour motion to amend the pleadings for multiple reasons including: (1) that VIP did not have adequate justification for its failure to move to amend before trial began; (2) that as a result of that failure, the issue of dissolving the consent decree had not been presented clearly or litigated fully during the trial; (3) that granting leave to amend therefore would have required reopening the trial to take additional evidence; and (4) that this would have

prolonged and complicated an already lengthy and complex proceeding and would have interfered with the orderly administration of the court's own calendar. While the court might have ruled otherwise, reopened the evidentiary hearing and dealt with the question of dissolution, we are not prepared to conclude that the court abused its discretion in declining to do so. *See, e.g., Howard Univ. v. Good Food Servs., Inc.*, 608 A.2d 116, 120–22 (D.C.1992). VIP was and remains free to file a separate petition to dissolve the consent decree if it thinks sufficient grounds exist for doing so.

**B.**

■ FMC contends that the trial court erred by construing too narrowly the provision of the consent decree requiring VIP to account "for all profits made by [it] from conducting business in the District of Columbia using Federal Marketing's name at any time." The trial court construed this requirement to apply only to the sales that VIP made—the "actual business" that VIP transacted—and accordingly ruled that the consent decree covered only VIP's sales or shipments to federal government offices that were located in the District of Columbia. FMC argues that the prohibition in the consent decree also applied to VIP's submission of bids in the District of Columbia for General Services Administration (GSA) contracts and that the requirement to account for profits therefore covered sales that VIP made in accordance with such contracts to federal government offices located outside the District.[4] In a

---

raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings," and the pleadings may be amended "at any time, even after judgment," to conform to the evidence. *See Town Ctr. Mgmt. Corp. v. Chavez*, 373 A.2d

238, 245 n. 8 (D.C.1977); *see also Jacobson v. Jacobson*, 277 A.2d 280, 283 (D.C.1971).

4. The GSA approves federal supply contracts with commercial vendors such as VIP on the basis of competitive bidding. For many products (though not all), the GSA requires the bids to be submitted at a location in the

similar vein, though somewhat less clearly, FMC argues that the consent decree also covered sales that VIP made directly to government agency offices outside the District of Columbia under so-called "blanket purchase agreements" that the agencies previously had approved within the District. The trial court rejected these arguments. We uphold the court's determination.

■■■■ As a general proposition, civil contempt of a court order, including a consent decree, may be established only if the order allegedly violated is "specific and definite," *SEC v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 439 (2d Cir.1987) (citations omitted), or "clear and unambiguous." *AccuSoft Corp. v. Palo*, 237 F.3d 31, 47 (1st Cir.2001) (citations omitted). "Courts are to construe ambiguities and omissions in consent decrees as redounding to the benefit of the person charged with contempt." *Id.* (internal quotation marks and citation omitted). These principles should be applied with the recognition that a consent decree is a contract that was negotiated by the parties to it as well as a court order. While the decree still must be "construed within its four corners," *Moore v. Jones*, 542 A.2d at 1254, the court has the duty to interpret ambiguous provisions, if possible, in light of what the evidence shows the parties themselves intended. As with any contract, the fact finder may examine extrinsic evidence to clarify genuine ambiguities in a consent decree. The trial court's resolution of the meaning of an ambiguous provision in light of extrinsic evidence is a factual finding that we will not reverse unless it is plainly wrong or without evidence to support it. *Waverly Taylor, Inc.*

*v. Polinger*, 583 A.2d 179, 182 (D.C.1990). *Id.; see also* D.C.Code § 17–305 (2001).

In the present case, we think the operative language of the consent decree— "profits made by [VIP] from conducting business in the District of Columbia using Federal Marketing's name at any time"— is indeed ambiguous and reasonably susceptible to either FMC's or VIP's and the trial court's reading. As the component terms of this phrase are nowhere defined in the consent decree, the language is ambiguous in several respects. For instance, does the term "conducting business" encompass virtually any act that a for-profit entity such as VIP might perform, or is it limited to completed transactions or something in between? What triggers the duty to account for profits—any "use" of the words "Federal Marketing," however tangential or immaterial, or only uses of the name that are genuinely misleading or otherwise material to the business transaction or activity in question? What does it mean to say that profits are "made from" the prohibited conduct? How directly or proximately related to VIP's wrongful conduct must the profits be? In support of VIP's and the trial court's reading of the consent decree, it can be argued that profits are "made from" completed business transactions (such as actual sales to federal offices), not from preparatory activities that merely pave the way for such transactions (such as the prior submission of VIP's bids to the GSA for its approval). In support of FMC's reading, on the other hand, it can be argued that but for GSA approval of VIP's bids (or agency approval of a blanket purchase agreement), VIP would have been unable to make its sales and earn its profits.

District of Columbia. Sometimes the contracts are negotiated or administered from locations in the District of Columbia as well. Once the GSA approves a vendor's contract

bid, federal government offices around the country are permitted to place orders directly with the vendor. The orders are governed by the terms of the GSA-approved contract.

The trial court's limitation of the accounting requirement in the consent decree to actual sales made by VIP in the District of Columbia using the "Federal Marketing" name is a plausible reading. It also has the virtue of comparative simplicity of application, since it avoids some of the potentially difficult questions of scope that must be answered if a broader reading is adopted. Other provisions of the consent decree arguably lend some support to the trial court's reading as well. For example, while the decree required VIP to cease and desist from maintaining any listing in the District of Columbia telephone directory under a name not readily distinguishable from Federal Marketing's name, the decree did not prohibit VIP from continuing to use that name in other local directories, notwithstanding the real possibility that federal agencies in the District of Columbia might make use of such directories. The fact that the consent decree specifically prohibited VIP from participating in a local trade show as "Federal Marketing" also could be taken to indicate that the focus of the decree was on preventing confusion among FMC's potential and actual customers in the District of Columbia. Furthermore, the trial court thought, not unreasonably, that the simplicity and brevity of the consent decree—its absence of a compliance or monitoring mechanism, and the very fact that lawyers would use a term such as "conducting business" without defining it—argued in favor of a narrower rather than a broader reading of its scope.

Importantly, too, the trial court appreciated that the consent decree embodied a settlement agreement in which each side compromised its position. Thus, the court deemed it highly significant that the parties agreed to permit VIP to continue doing business with the federal government outside the District of Columbia under the "Federal Marketing" *nom de guerre*. Given that the parties and their lawyers, all of whom were familiar with the realities of government contracting, knew that VIP would still be required to submit bids to the GSA (or proposed blanket purchase agreements to other agencies) within the District as a precondition to carrying on such business elsewhere, the court found it unlikely that the consent decree restricted VIP's use of the name "Federal Marketing" in such obligatory submissions without saying so explicitly.[5] It is true that without such a restriction the consent decree might be less effective in fulfilling FMC's goal of preventing confusion about its identity among its government customers. But precisely because the consent decree represents a compromise, its scope cannot be discerned merely "by reference to what might satisfy the purposes of one of the parties." *United States v. Armour & Co.*, 402 U.S. 673, 682, 91 S.Ct. 1752, 29

5. To expand on this point, when FMC wrote to VIP in November 1981—before the entry of the consent decree—concerning VIP's agreement not to use the Federal Marketing name in the District of Columbia, FMC called specifically for "name changes in contracts with the General Services Administration [and] . . . in any Blanket Purchase Agreements and Blanket Delivery Orders [that VIP] now holds in the name of Federal Marketing Company." It is not entirely clear from VIP's December 1981 response whether VIP agreed to make such changes; VIP promised only that "[a]ll references in contracts, purchase agreements, and delivery orders in the District of Columbia will be in the name of F M C of Virginia, Inc. a division of [VIP]." But whatever the scope of the parties' 1981 agreement, it is striking that when FMC sued VIP in 1982 for breaching that agreement, the consent decree that the parties negotiated said nothing at all about GSA contracts and blanket purchase agreements. In view of the events leading up to the consent decree, it was not unreasonable for the trial court to infer that the omission of any reference to GSA contracts and blanket purchase agreements in the decree was not inadvertent or without significance.

L.Ed.2d 256 (1971); *accord, District of Columbia v. Jerry M.,* 571 A.2d 178, 185 (D.C.1990).

In light of these considerations, we cannot conclude that the trial court's construction of the consent decree was either plainly wrong or without evidence to support it. We must therefore reject FMC's contention that the court erred in this regard.

### C.

■■■ FMC next contends that the trial court erred in partially upholding VIP's defense of laches. Although FMC did not file its petition to hold VIP in contempt of the March 1982 consent decree until August of 1994, it claimed that VIP had violated the decree from its inception and demanded that VIP be ordered to account—as the decree in terms provided—for all profits that it had ever made from conducting business in the District of Columbia using Federal Marketing's name "at any time, including but not limited to" the period before the decree was entered. The trial court concluded that FMC had slept on its rights and that the full rigor of the equitable remedy of an accounting had to be tempered in order to be fair to VIP and to ensure reliable fact finding. The court therefore limited the accounting it ordered to the five year period beginning in 1989. Objecting to this curtailment, FMC argues that VIP waived the defense of laches by failing to raise it as an affirmative defense in its answer. In addition,

FMC argues that its delay in asserting its rights under the consent decree was neither unreasonable nor prejudicial to VIP. The question is a close one, but on balance we think the trial court's ruling must be affirmed.[6]

■■■ "Laches is the principle that equity will not aid a plaintiff whose unexcused delay, if the suit were allowed, would be prejudicial to the defendant." *American Univ. Park Citizens Ass'n v. Burka,* 400 A.2d 737, 740 (D.C.1979) (internal quotations and citation omitted); *accord, Powell v. Zuckert,* 125 U.S.App. D.C. 55, 57, 366 F.2d 634, 636 (1966) ("The defense of laches stems from the principle that 'equity aids the vigilant, not those who slumber on their rights,' and is designed to promote diligence and prevent enforcement of stale claims." (citation omitted)). "To establish the defense the evidence must show both that the delay was unreasonable and that it prejudiced the defendant." *Id.; accord, American Univ. Park Citizens Ass'n,* 400 A.2d at 740. Of these two components, "[u]nquestionably, prejudice is the primary factor." *Beins v. District of Columbia Bd. of Zoning Adjustment,* 572 A.2d 122, 128 (D.C.1990). Nevertheless, "if the delay is lengthy, a lesser showing of prejudice is required," *Gull Airborne Instruments, Inc. v. Weinberger,* 224 U.S.App. D.C. 272, 277, 694 F.2d 838, 843 (1982); *accord, Warren v. Chapman,* 535 A.2d 856, 860 (D.C.1987). When the delay is measured in years rather than months, reliance interests grow, memories dim, evidence is

---

**6.** FMC also asserts in passing that the trial court erred in not requiring VIP to account for profits earned in violation of the consent decree after 1993, i.e., beyond the termination of the five year period starting in 1989. It is doubtful whether FMC preserved this issue. Although FMC initially asked that the accounting be extended to reach violations committed by VIP through the date of trial (in May 1996), FMC appeared to concede that violations after 1993 were negligible. The

trial court then expressed its intention to limit the accounting to the period in which a substantial number of violations occurred, and FMC did not object. Assuming, though, that FMC did preserve for appeal its objection to a 1993 terminus for the accounting, it has abandoned the claim by asserting it only perfunctorily in its brief. *See Wagner v. Georgetown Univ. Med. Ctr.,* 768 A.2d 546, 554 n. 9 (D.C. 2001).

lost, and prejudice may be inferred more readily.

■ On appeal, a trial court's ruling on laches presents us with "a mixed question of fact and law" that calls for a mixed standard of review. *American Univ. Park Citizens Ass'n,* 400 A.2d at 741. "[A]nswers to the factual questions bearing on prejudice to the defendant from delay and on plaintiffs' earlier awareness of the claim are for the trial court, whose findings will be accepted unless 'clearly erroneous.' " *Id.* (citations omitted). "Whether the facts, taken together, are sufficient to sustain the defense of laches, however, is a question of law which the appellate court will review without need for deference to the trial court's judgment." *Id.* (citations omitted).

■ Turning to FMC's claims, we do not agree that VIP waived its affirmative defense of laches by failing to raise it in its answer to FMC's petition. *See* Super. Ct. Civ. R. 8(c). While a party's failure to plead an affirmative defense as directed by Rule 8(a) may result in a waiver, the principle is read in light of Rule 15(a) (leave to amend shall be freely given when justice so requires), *see Osei–Kuffnor v. Argana,* 618 A.2d 712, 714–15 (D.C. 1993), and is subject to other discretionary exceptions such as where the party raises the defense by pretrial motion in a manner that does not occasion unfair surprise or impede the due administration of justice. *See, e.g., Flippo Constr. Co. v. Mike Parks Diving Corp.,* 531 A.2d 263, 267–68 (D.C.1987); *Whitener v. WMATA,* 505 A.2d 457, 458–60 (D.C.1986). VIP put FMC on notice of its affirmative defense of laches in its summary judment pleadings, and FMC had and exercised a full and fair

opportunity to meet it. There was no prejudice and hence no waiver.[7]

Because the trial court ruled on VIP's laches defense from the bench and did not elaborate on the basis for its ruling in its subsequent written order, its findings on the issues of unreasonable delay and prejudice are not as comprehensive as they might have been. This has hampered but not thwarted our review. The trial court found that after entering into the consent decree, VIP conducted its business in a dual fashion. As permitted by the decree, VIP sought over the course of the next decade to do business in the District of Columbia under the name of FMC of Virginia while continuing openly to use the "Federal Marketing" name outside the District. FMC knew this. FMC also knew that the consent decree contained no compliance mechanism and required no specific procedures for VIP to follow even though VIP had failed to adhere to its prior agreements to respect FMC's rights to its name. Yet in spite of its awareness of all these facts, FMC was not vigilant in protecting its rights under the decree. The evidence showed that with virtually no effort, FMC could have learned (as it ultimately did) that VIP was using its name in sales to federal government offices located in the District. FMC's owner William Grote testified, for example, that when he finally did bestir himself to investigate in December 1993, he found VIP's sales reports, government contracts and catalogs readily available for public inspection at the GSA information center. These records disclosed to him that VIP was using the Federal Marketing name in its dealings in the District of Columbia. When asked why he had not gone down to the

---

7. FMC also argues that VIP waived the defense of laches when it entered into the consent decree, because the decree provides that in the event of a violation, VIP "shall" be ordered to account for all the profits it earned improperly "at any time." We are not persuaded. Laches was not mentioned in the consent decree.

GSA information center in the decade before 1993, Grote said only that he "had no reason to." Grote also testified that when he looked in the Northern Virginia telephone directory in 1993, he saw for the first time that VIP was holding itself out there as "Federal Marketing Company, Washington, D.C." When asked why he never previously had checked how VIP listed itself in that directory, Grote again said only that he "had no reason to."

From this evidence,[8] the trial court reasonably could find that FMC had or should have had "knowledge of [its] rights and an ample opportunity to establish them in the proper forum," *American Univ. Park Citizens Ass'n,* 400 A.2d at 742 (quotation marks and citation omitted), that it failed to exercise diligence, and that its decade-long delay in seeking legal recourse was not excused. This is not a case in which there was fraudulent conduct by the defendant that would excuse the plaintiff's long delay, as envisioned in *King v. Kitchen Magic, Inc.,* 391 A.2d 1184, 1187 (D.C. 1978) ("So great is its abhorrence of fraud and the violation of fiduciary obligations, that a court of equity will look with some indulgence upon mere delay, from which no material injury has occurred.") (internal quotation marks and citation omitted). *Cf. Watwood v. Yambrusic,* 389 A.2d 1362, 1363 (D.C.1978) (holding six year lapse of time unreasonable where plaintiff "knew or should have known ... that she might have a cause of action").

The trial court viewed FMC's delay in asserting its rights as prejudicial to VIP in two principal respects. First, having seen firsthand what it called the "monumental effort" that had to be mounted to establish substantive violations of the consent decree over the preceding decade, and being cognizant of the voluminousness of the relevant records and the difficulty of accounting for profits from violations, the court was especially concerned that a time limit was needed to ensure the presentation of "reliable facts and figures."[9] *Cf. Powell,* 125 U.S.App. D.C. at 59, 366 F.2d at 638 ("The prejudice normally contemplated in applying laches ... stems from such factors as loss of evidence and unavailability of witnesses, which diminish a defendant's chances of success.") Second, the court emphasized the importance to it of the fact that, following the entry of the consent decree, VIP had instituted and attempted to adhere (albeit imperfectly) to its own internal plan for complying with the decree while still exercising its right to do business under the "Federal Marketing" name outside the District of Columbia. For instance, VIP utilized two sets of stationery, business cards, invoices, promotional materials and other business documents and set up a time consuming and labor intensive process for checking that the documents used for sales or shipments into the District had only the FMC name on them. VIP argued that it would have altered its practices and strengthened its compliance procedures early on had FMC not delayed in notifying it of its com-

---

**8.** Although the trial court did not rely on it, there also was evidence that FMC was put on actual notice as early as 1987 that VIP might have been violating the consent decree and still failed to protect its rights. In that year, William Grote testified, he received a check from the Treasury Department made out to "Federal Marketing Office." Upon inquiry he learned that the check was intended for FMC of Virginia (i.e., VIP). Grote concluded, however, for reasons that he did not explain, that the mistake was solely that of the government and that VIP had not violated the consent decree.

**9.** As the court stated, it wanted to set aside "stuff that is so old that it would be hard for the court to determine whether it's acting on reliable evidence."

plaints. While the evidence that VIP was prejudiced was by no means overwhelming, the trial court was entitled to accord some weight to VIP's argument. All things considered, though the question is a close one, we think that, given the extraordinary length of FMC's delay and the absence of fraud, the court could find sufficient prejudice to invoke the doctrine of laches and limit FMC's right to recover VIP's profits to a reasonable period of time before FMC filed its petition. The five-year period that the trial court chose strikes us as reasonable; generous even, inasmuch as it was two years beyond the statutory limitations period applicable to an action at law for breach of contract. *See* D.C.Code § 12–301(7) (2001). *Cf. King,* 391 A.2d at 1187 (observing that as a general rule in applying doctrine of laches, absent fraud, "courts of equity, in cases of concurrent jurisdiction, consider themselves bound by statutes of limitations governing actions of law") (citation omitted).

▅▅▅▅ We are not persuaded by FMC's argument that the doctrine of laches was inapplicable because it had no duty to monitor VIP's compliance with a court order. It is true that "[o]ne who is subject to a court order has the obligation to obey it honestly and fairly, and to take all necessary steps to render it effective." *D.D. v. M.T.,* 550 A.2d at 44. Laches is not, strictly speaking, a defense in a civil contempt proceeding. But "[t]he decision whether to hold a party in civil contempt is confided to the sound discretion of the trial judge, and will be reversed on appeal only upon a clear showing of abuse of discretion." *Id.* As that case illustrates, when the trial court finds a party in civil contempt, it has broad discretion to impose a "temperate" sanction in light of equitable considerations. *Id.,* 550 A.2d at 45. We uphold that discretion here.

## D.

FMC and VIP each raises a challenge to the trial court's award of attorneys' fees to FMC. Neither challenge persuades us to alter that award.

As part of their consideration of appropriate sanctions that the trial court might impose on VIP for its violations of the consent decree, the co-special masters examined the attorneys' fees that FMC incurred to enforce the decree. The co-special masters advised that while the court might view FMC's claim for recovery of its legal expenses as "weakened" by its dilatoriness in initiating the contempt proceeding, "it is undeniable that the numbers of VIP's violations of the decree and inaccurate compilations of sales records have prolonged the time and effort required for the damage analysis ordered by the Court." FMC submitted legal expenses totaling $176,324.42 (including $30,000 that it had paid to compensate the co-special masters for their work). Of this amount, the co-special masters found that approximately $34,500 was for legal work that was duplicative, not clearly related to the enforcement action, or otherwise subject to dispute. Finding the balance of FMC's attorneys' fees to have been reasonable, the co-special masters recommended that FMC be reimbursed to the extent of $140,000 (a figure they evidently obtained by subtracting the entire $34,500 from the total amount and then rounding down the result).

VIP objected to such an award on several grounds: (1) the consent decree did not provide for attorneys' fees, (2) VIP had not violated the decree willfully or in bad faith, (3) FMC had achieved only partial success on its claims and $140,000 was high in comparison to the lost profits award of $165,560.51 that the co-special masters recommended, and (4) other factors potentially relevant to the amount of any award of

attorneys' fees had not been considered. FMC, on the other hand, pronounced itself "generally satisfied" with the co-special masters' attorneys' fees recommendation and did not object to the proposed $34,500 reduction. FMC suggested instead that the reduction undercut VIP's request for a further discount.

After the trial court received the parties' objections to the co-special masters' recommendations, it scheduled an evidentiary hearing at which the co-special masters appeared to be questioned by the court and the parties about all aspects of their recommendations. At the outset of the proceeding, the court identified VIP's objections to the attorneys' fees as one of the "areas of primary concern." The court also expressed interest in hearing what problems the co-special masters found with $34,500 worth of FMC's attorneys' fees. In spite of this invitation by the court for the parties to make inquiry, neither FMC nor VIP elected to examine the co-special masters on their attorneys' fees recommendation, and neither party offered evidence to contest that recommendation.

Thereafter, in its final order, the trial court ruled that since the consent decree embodied a court order, FMC could recoup the legal expenses it had incurred to enforce it. Relying on this court's decision in *Link v. District of Columbia*, 650 A.2d 929, 931 (D.C.1994), the trial court further held that FMC did not need to show that VIP had violated the decree willfully in order to recover such expenses. The court then focused on the co-special masters' computation of FMC's recoverable legal expenses, including the subtraction of the "questionable" $34,500 from the total amount of $176,324.42. Noting that "neither party challenged the Special Masters' finding in this regard nor their calculation," the court corrected what it called a clearly erroneous subtraction error (actu-

ally, we surmise, a deliberate rounding off by the co-special masters) and awarded FMC its attorneys' fees and costs in the amount of $141,824.42 instead of the recommended sum of $140,000.

▪ FMC now asks us to find that the trial court erred in not awarding it the $34,500 that the co-special masters found to be "questionable." This claim comes too late. By failing to contest the $34,500 cut in the trial court, and instead stating that it was "generally satisfied" with the co-special masters' recommendation, FMC forfeited its challenge to the attorneys' fees it was awarded. *See Williams v. Gerstenfeld*, 514 A.2d 1172, 1177 (D.C. 1986); *Miller v. Avirom*, 127 U.S.App. D.C. 367, 369–71, 384 F.2d 319, 321–23 (1967).

▪ VIP's objections to the attorneys' fee award fail to persuade us on their merits. The court had the discretion to award FMC the attorneys' fees it reasonably incurred to prosecute VIP for civil contempt even absent a finding that VIP's violation of a court order was willful. *See Link*, 650 A.2d at 931–34; *accord, In re Banks*, 805 A.2d 990, 1004 (D.C.2002); *D.D. v. M.T.*, 550 A.2d at 44. Indeed, we have said that granting such relief should be "the norm, for if the contemnor had obeyed the order of the court, the aggrieved party would not have required further assistance of counsel." *Link*, 650 A.2d at 933. It makes no difference that the court order in question was a consent decree that did not contain a specific attorney's fee provision, for it was still a court order and VIP was still in contempt of it. *See, e.g., Abbott Lab. v. Unlimited Bev., Inc.*, 218 F.3d 1238, 1242 (11th Cir.2000) (affirming award of attorneys' fees in civil contempt proceeding to enforce compliance with consent judgment).

The determination of the reasonableness of the amount of an attorneys' fee award is left to "the sound discretion of the trial court." *Frazier v. Franklin Inv. Co., Inc.,* 468 A.2d 1338, 1341 (D.C.1983); *accord, Link,* 650 A.2d at 933 n. 9. This court will modify the award "only ... upon proof of an abuse of discretion." *Frazier,* 468 A.2d at 1341. In most situations, a reasonable fee is computed by first determining the so-called lodestar—the number of hours reasonably expended by counsel multiplied by a reasonable hourly rate— and then, "in exceptional cases," making upward or downward adjustments as appropriate.[10] *Hampton Courts Tenants Ass'n v. District of Columbia Rental Hous. Comm'n,* 599 A.2d 1113, 1115 (D.C. 1991); *see also Ungar v. District of Columbia Rental Housing Comm'n,* 535 A.2d 887, 892 (D.C.1987). A number of discrete factors that may support adjustment of the lodestar figure have been identified for consideration. *See Frazier,* 468 A.2d at 1341 n. 2 (listing twelve factors). Not all of these potentially relevant factors are pertinent in every case, however, and most are subsumed within the basic criterion that the time expended and the rate charged be reasonable. *See Hampton Courts Tenants Ass'n,* 599 A.2d at 1115 n. 8.

Ordinarily we expect the trial court to explain how it arrived at its award of attorneys' fees, though "a precise analysis ..., utilizing each of the *Frazier* factors, is not required." *Ungar,* 535 A.2d at 890; *accord, Frazier* at 1342. In many cases, "[t]he failure to articulate the reasons for a particular fee award renders the trial court's determination effectively unreviewable and has been held to constitute an abuse of discretion warranting reversal." *Frazier,* 468 A.2d at 1341. VIP argues that the award in this case is vulnerable on this ground, in particular because the trial court did not reduce the award to reflect the fact that its rulings had limited FMC's potential recovery— specifically, its rulings that we uphold in this opinion on the scope of the consent decree and laches. *See Fleming v. Carroll Publ'g Co.,* 581 A.2d 1219, 1229 (D.C.1990) ("[W]here a party is only partially successful, the trial court must exercise its discretion to determine what amount of fees, if any, should be awarded.").

On the facts of this case, we are persuaded that no reversal or remand for the trial court to articulate its reasoning further is required. It is plain from the record that the court paid careful attention to the size and propriety of the award it entered. We are satisfied that the trial court did not abuse its discretion in awarding the fees it did, and we see no likelihood that the court would change its mind on a remand and reduce its award. There is no dispute that FMC's attorneys' fees were calculated in basic compliance with the lodestar methodology of multiplying hours expended on the litigation by the applicable hourly billing rate. Setting aside the "questionable" $34,500 that the co-special masters recommended be cut entirely (a cut that may well have been more drastic than necessary), there is no claim that the hours worked were unreasonable or unrelated to the contempt proceeding, or that

---

10. We have no doubt that the lodestar approach is appropriate in civil contempt proceedings, though we have hesitated to mandate its use in that context, perhaps because the fee award may serve to compel compliance in addition to compensating the aggrieved party. *See Link,* 650 A.2d at 934 n.

11. Federal courts have employed the lodestar approach in civil contempt cases. *See, e.g., Microsoft Corp. v. United Computer Res. of N.J., Inc.,* 216 F.Supp.2d 383, 387 (D.N.J. 2002); *Halderman v. Pennhurst State Sch. & Hosp.,* 533 F.Supp. 649, 660 (E.D.Pa.1982).

the attorneys' billing rates were unreasonably high. The independent co-special masters evaluated the legal expenses and found them (apart from the $34,500) to be reasonable overall. This primarily factual finding was not shown to be clearly erroneous; though VIP was afforded the opportunity to cross-examine the co-special masters and present evidence to the contrary, it did neither. The trial court therefore was entitled, if not obliged, to accept the co-special masters' determination. *See Godette v. Estate of Cox*, 592 A.2d 1028, 1032 (D.C.1991) (holding that pursuant to Super. Ct. Civ. R. 53(e)(2), findings of fact made by a special master may not be set aside unless they are clearly erroneous).

■■■ VIP's main argument is that the award should have been reduced because FMC was not wholly successful in its claims. We find this argument unconvincing in light of the realities of the litigation. Although FMC did not win every legal ruling, the case was an exceptionally complex one that mandated an extensive investigation of VIP's entire course of business conduct over many years in order to establish that its noncompliance with the consent decree was truly contemptuous. The full scope of VIP's noncompliance needed to be explored and defined, and it would be unfair to penalize FMC for doing so. FMC prevailed on the main point by establishing that VIP had violated the consent decree and that its pervasive pattern of disobedience was (in the words of the co-special masters) "too great to be characterized as reasonable .... [and] at best so negligent as to constitute gross negligence, and, arguably, in reckless disregard of VIP's obligations."

Apart from its claim that FMC prevailed only partially, which we find unpersuasive, VIP has not pressed any substantial claim—here or in the trial court—that a significant downward adjustment of the attorneys' fee award would be appropriate. While further articulation of the basis of the award might have been desirable (and would have made appellate review easier, a benefit this court certainly does not minimize), VIP has not met its burden of showing an abuse of discretion. A remand for the trial court to elaborate on its reasons would be a waste of time and money.

**E.**

FMC's next claim is that the trial court should have awarded prejudgment interest on the profits that it ordered VIP to disgorge. We agree that the trial court had discretion to award prejudgment interest, but not that the court abused its discretion in declining to do so in this case.

■■■ The purpose of awarding prejudgment interest as part of the damages for breach of contract is to compensate the creditor for the loss of the use of money over time. *See Riggs Nat'l Bank v. District of Columbia*, 581 A.2d 1229, 1253 (D.C.1990). Strictly speaking, an award of prejudgment interest is not mandatory where (as in this case) the claim is unliquidated[11] and interest is not specifically required by the contract itself or by law or prevailing usage. *See* D.C.Code § 15–109 (2001); *cf.* D.C.Code § 15–108 (2001). But whether the amount of the debt is readily ascertainable is a less important consideration than whether "the plaintiff has been deprived of the use of the money withheld and should be compensated for the loss." *Pierce Assoc., Inc.*, 527 A.2d at

---

11. "A liquidated debt is one which 'at the time it arose, ... was an easily ascertainable sum certain.'" *District of Columbia v. Pierce Assoc., Inc.*, 527 A.2d 306, 311 (D.C.1987) (quoting *Kiser v. Huge*, 170 U.S.App. D.C. 407, 421, 517 F.2d 1237, 1251 (1974), *rev'd in part on other grounds*, 171 U.S.App. D.C. 1, 517 F.2d 1275 (1975) (en banc)).

311. "Where the debtor should have paid what he owed but did not do so, a denial of pre-judgment interest would deny full compensation to the creditor while allowing the recalcitrant party to take advantage of his own wrong and become the richer for it." *Riggs Nat'l Bank*, 581 A.2d at 1253. Thus, while the "general rule" may be that prejudgment interest is "usually unavailable in breach of contract cases involving unliquidated claims," *Pierce Assoc., Inc.*, 527 A.2d at 310, the court has ample discretion to include prejudgment interest "as an element in the damages awarded, if necessary to fully compensate the plaintiff." D.C.Code § 15–109. The court usually should award such "delay damages" in such cases "absent some justification for withholding such an award." *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983) (affirming award of prejudgment interest on reasonable royalties awarded as damages for patent infringement, though damages were unliquidated); *see also Waite v. United States*, 282 U.S. 508, 509, 51 S.Ct. 227, 75 L.Ed. 494 (1931) (holding that where patent owner had been awarded unliquidated damages for patent infringement in the form of lost profits, an award of prejudgment interest was necessary "to make the compensation 'entire'" and to ensure "complete justice" between the parties).

■■■ Before now this court has not addressed whether a court has the authority to award prejudgment interest as one of the sanctions for civil contempt. We think there can be no doubt about the answer to that question, however. Given the remedial purpose of civil contempt sanctions, and since "no explicit statutory authorization is required for an award of prejudgment in-

terest," *Riggs Nat'l Bank*, 581 A.2d at 1254, a court has discretion to order a civil contemnor to pay prejudgment interest when such an award is necessary to compensate fully the party aggrieved. *See, e.g., Wzorek v. Chicago*, 906 F.2d 1180, 1181 (7th Cir.1990) (affirming an award of damages including prejudgment interest for violation of consent decree).

■■■ In the present case, the co-special masters provided a prejudgment interest computation[12] but recommended that the trial court exercise its discretion not to award such interest. "We are influenced in our recommendation that interest not be paid," the co-special masters stated, "by the fact that, although VIP has had the use of money which could have been demanded by [FMC] as early as 1989, [FMC] made no demand until 1994."

■■■ The trial court accepted the co-special masters' recommendation without comment. This was, in our view, no abuse of discretion. The consent decree certainly did not require prejudgment interest. The decree specified the remedy for its violation and omitted any provision for such interest even though the parties recognized that an accounting for improper profits might cover a period of several years. Most important, the court had substantial justification for withholding an award of prejudgment interest. The court reasonably could view an award without such interest as sufficient to compensate FMC, especially since FMC did not show that it would have earned any more profits itself if VIP had complied with its obligations under the consent decree. Moreover, as the co-special masters suggested, the court had reason not to reward FMC for its dilatoriness in seeking to enforce its

---

12. Using the six-month U.S. Treasury bill interest rate, which varied between 3.14% and 7.47% during the years 1989 to 1993, the co-special masters arrived at a figure of $56,768.19 for prejudgment interest.

rights under the decree. "[I]t may be appropriate to limit prejudgment interest, or perhaps even deny it altogether, where the [plaintiff] has been responsible for undue delay in prosecuting the lawsuit." *General Motors Corp.*, 461 U.S. at 657, 103 S.Ct. 2058.

### F.

 FMC advances an assortment of reasons why the trial court should have rejected the findings of the co-special masters. *First*, FMC complains that when records were "unavailable, voluminous or difficult to obtain," the co-special masters "simply exclude[d]" such records from their consideration in identifying transactions that violated the consent decree and calculating the profits that VIP earned on such transactions. FMC contends that in so doing, the co-special masters improperly relieved VIP of its burden of proving that its profits did not derive from violations. *Second*, FMC complains that the co-special masters made factual determinations that were contradicted by the evidence at trial.[13] FMC contends that the co-special masters' report and the trial court's final order therefore were based on clearly erroneous facts. *Third*, FMC complains about the co-special masters' refusal to find an automatic violation of the consent decree whenever a government office located in the District of Columbia made a payment to VIP under the name "Federal Marketing." The co-special masters concluded that VIP was not always responsible for how it was identified in the government's data bases,[14] and that the actual "geographic source" of each and every government payment to VIP could not be ascertained through reasonable investigation. FMC contends that VIP violated the consent decree whenever it accepted a payment in the name of "Federal Marketing" from a government office in the District of Columbia without informing the sender of its error. FMC also contends that the co-special masters could have ascertained the true source of each payment, and that they should have placed the burden on VIP to prove that any payments it received in the name of "Federal Marketing" were not attributable to violations of the consent decree.

 The short answer to all these contentions is that they fall far short of meeting FMC's burden on appeal, which is

---

13. Specifically, the co-special masters stated in their report that in their view, the product catalogs that VIP mailed to or used in the District of Columbia did not violate the consent decree. VIP's president had admitted the contrary at trial. At the evidentiary hearing on the parties' objections to the report, co-special master Levy testified that even if VIP's use of the product catalogs in the District of Columbia was improper (because the Federal Marketing name appeared in the catalogs), the effect on VIP's sales was "totally speculative" and impossible to quantify.

In addition, the co-special masters appeared in their report to credit—or, at least, declined to discredit—two VIP sales representatives who said that they never represented themselves in the District of Columbia as being from Federal Marketing Company. There was evidence to the contrary at trial.

14. The report of the co-special masters states:

Further, if payment from the District of Columbia resulted from a data base maintained by the federal government, and not from an improper VIP invoice, we do not consider it a violation of the injunction. It would be unreasonable to place on the defendant a responsibility for policing the federal government's data bases. We have been more concerned with overt actions by the defendant that might cause those federal data bases to contain an improper name, and where an invoice improperly issued in the name of Federal Marketing Company caused the payment to be generated in an improper name, it has otherwise been treated in our calculations as a violation....

to establish that the findings of fact made by the co-special masters and accepted by the trial court were clearly erroneous. "When an accounting has been referred to a special master, the trial court is required to adopt the master's findings of fact unless clearly erroneous." *Beckman v. Farmer,* 579 A.2d 618, 643 (D.C.1990); *see* Super. Ct. Civ. R. 53(e)(2). "The master's findings are presumptively correct, ... and the party excepting to them bears the burden of showing clear error." *Id.* (citation omitted); *accord, Oil, Chemical & Atomic Workers Int'l Union v. NLRB,* 178 U.S.App. D.C. 278, 283, 547 F.2d 575, 580 (1976) ("[T]he court must uphold a finding, even if it is thought to go against the weight of the evidence, unless the error is clear.") The same strict standard of review applies on appeal. When the trial court adopts the special master's findings, they are "considered as the findings of the Court." Super. Ct. Civ. R. 52(a). On appeal such findings, "whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous." *Id.; see also Godette,* 592 A.2d at 1032; *Beckman,* 579 A.2d at 643.

In this case the co-special masters carried out a massive eleven-month investigation into the "extent and economic effect" of VIP's non-compliance with the consent decree over a five-year period. The co-special masters met with representatives of FMC and VIP to obtain their views and secure their cooperation, and they repeatedly pressed VIP in particular for more information and documentation. During their investigation the co-special masters made use of the entire trial transcript, voluminous documentation relating to VIP's sales and shipments into the District of Columbia (including sales invoices, shipping documents, credit memoranda, bills of lading, and miscellaneous other documents), and VIP's income tax returns, audited financial statements and internal financial statements for the years 1989 through 1993. The co-special masters discovered that the compendium of D.C. transactions used by VIP at trial was incomplete, so they supplemented it to create a more accurate "adjusted trial compendium." Then, because an examination of every single transaction that occurred over the course of five years would have been "prohibitively expensive," the co-special masters employed a sampling methodology. In brief, they sampled each year's D.C. sales, examined the sales documents for the sample transactions for violations of the consent decree in order to derive violation rates, applied the violation rates to the adjusted trial compendium to provide a base total of sales that violated the consent decree, and then applied an incremental profit rate to the total of violative sales.

Initially, the co-special masters found that, contrary to VIP's testimony at trial, VIP has sent "many documents [bearing the "Federal Marketing" name] ... into the District of Columbia uncorrected, or with manual redaction of all except the initial letters of each word in the improper name." Adversely to VIP, the co-special masters treated a D.C. transaction as a violation of the consent decree if its documentation included a sales invoice, shipping order, product return form or other document sent to the purchaser (such as a Federal Express form, correspondence, bill of lading, or credit card receipt [15])

15. VIP objected to treating credit card transactions as violations of the consent decree, arguing that they were post-sale transactions and that the inclusion of a reference to "Division Federal Marketing Company" militated against any confusion. The co-special masters rejected these arguments on the ground that "[a]llowing VIP to use an improper name in a document sent to a purchaser leads the purchaser to believe that FMC of Virginia is

bearing the name "Federal Marketing" or an inadequate redaction thereof. When initial sampling of thirty sales from each year's transactions produced a violation rate that was substantially higher than what VIP had represented in its trial compendium, the co-special masters increased the sampling to sixty sales per year for better accuracy. From their sampling of the adjusted trial compendium, the co-special masters found the proportion of VIP's annual District of Columbia sales transactions in the years 1989 through 1993 that violated the consent decree. The proportion ranged from 27.35% (in 1993) to 35.88% (in 1992). The co-special masters then applied these percentages to the corrected total dollar value of VIP's D.C. sales in the adjusted trial compendium to determine the amount of violative sales.

The next step was to calculate VIP's profits on such violative sales. The consent decree did not state how "profits" were to be measured, and the parties disagreed on the proper approach. VIP advocated using its overall net profits, as measured by deducting all of the company's costs from its total revenues. FMC argued for using the profits of the VIP division that sold products in the District of Columbia rather than the profits of the company as a whole. In addition, VIP argued for using an "incremental profit" figure, computed by deducting only variable costs and not fixed costs from divisional revenues. This approach recognizes that not all costs increase as production and sales increase. The co-special masters agreed with FMC on both counts. They concluded that defining "profit" as the "difference between revenue received from D.C. sales and the costs attributable to those sales has the effect of forcing VIP to disgorge the amounts that it would not have earned but for its violation of the

decree." Furthermore, they added, an incremental profit analysis would avoid "either unjustly enriching the wrongdoer by allowing improper profits to contribute to the fixed costs of proper activities or penalizing the violator by stripping it of profits lawfully earned." Applying incremental profit figures to the results of their sampling, the co-special masters calculated that VIP earned a total of $165,560.51 on violative D.C. sales in the years 1989 through 1993.

We evaluate the overall effort much the same way the trial court did. The assignment given to the co-special masters was a complicated one that called upon them to exercise professional accounting, business, and legal judgment in determining the facts. The co-special masters were selected for their expertise in those areas, they were disinterested in the outcome, and they carried out their task fairly and conscientiously. Given the magnitude of the engagement, it is not surprising that FMC can find some things to criticize in the co-special masters' performance over the course of eleven months. FMC's criticisms are not necessarily trivial. That said, however, the objections that FMC makes are essentially an attack on the violation criteria and the sampling technique that the co-special masters reasonably chose to employ in order to obtain reliable results in a factually murky, retrospective investigation of VIP's business behavior over a five-year time span. We are not persuaded that the co-special masters' method was seriously flawed. The co-special masters did not, in our view, relieve VIP of its burden of proof or shift the burden improperly to FMC. Rather, the co-special masters found that VIP violated the consent decree whenever reasonably stringent violation criteria were met. They were unwilling to find violations

Federal Marketing Company" whether the document is sent before or during a sale.

when the evidence did not appear to them to be reliable, unambiguous, and probative. That was their call as fact finders within a very wide range of tolerance. Furthermore, even if the co-special masters did err, for example, in evaluating VIP's product catalogs or in crediting its sales representatives' statements, that does not mean that the co-special masters materially underestimated the number of transactions that violated the consent decree with the methodology they used. We conclude that FMC has not shown that the co-special masters' computation of the profits that VIP earned in violation of the decree was clearly erroneous.

## III.

For the foregoing reasons, we affirm in all respects the trial court's adjudication of VIP in civil contempt and its award of sanctions.[16]

*So ordered.*

---

16. FMC asks that we instruct the trial court to amend its order to direct VIP not to continue violations in the future under penalty of further sanctions. As the 1982 consent decree has remained in effect, we think such an order superfluous and decline to require that it be entered.